UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel*. DEBRA MARSHALL and PEGGY THURMAN, DEBRA MARSHALL, individually, and PEGGY THURMAN, individually, | ) ) ) ) | 06 C 1746 |
| | ) | Judge Feinerman |
| Plaintiffs/Relators, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WOODWARD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Relators Debra Marshall and Peggy Thurman brought this *qui tam* suit on behalf of the United States, alleging that their former employer, Woodward, Inc., violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., in connection with its manufacture and sale of military parts to General Electric and the Department of Defense. Doc. 1. Marshall and Thurman also brought retaliation claims on their own behalf under the FCA's anti-retaliation provision and Illinois law, alleging that Woodward fired them for questioning its improper conduct. *Ibid*. Nearly six years later, the Chief Judge unsealed the complaint after the United States declined to intervene. Docs. 17-19. Relators filed an amended complaint, Doc. 24, which survived a motion to strike, Doc. 49, and then filed a corrected amended complaint, Doc. 55. With the parties' agreement, a three-week jury trial has been set for May 18, 2015. Doc. 240.

Now before the court is Woodward's motion for summary judgment, Doc. 197, and Relators' motions for leave to file a surreply brief, Docs. 224, 230. Relators' motions are granted, and the court has considered their surreply in considering Woodward's motion, which is granted as well.

**Background**

The facts are set forth as favorably to Relators as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

**A.     The T2 Sensor**

Woodward manufactures a device called the "T2 sensor" under contracts with General Electric ("GE") and the United States Department of Defense ("DoD"). Doc. 204 at ¶¶ 2-3. The T2 sensor is a component of another device called the "T700 HMU," which regulates fuel flow in the GE T700 engine that the military uses in Blackhawk and Apache helicopters. *Ibid*. Woodward sells T2 sensors to GE (to incorporate into T700 engines) and DoD (for spare and replacement parts). *Id*. at ¶ 3.

The T2 sensor has a "coil" end and a "bellows" end. *Id*. at ¶ 5. The two ends are connected by a "capillary tube" encased in a flexible "armor cable." *Ibid*. A photo is here:

**Bellows End**                                                    **Coil End**



Doc. 199 at ¶ 5. The "coil" end measures changes in air temperature. Doc. 204 at ¶¶ 5-6. Such changes cause alcohol in the capillary tube to expand or contract, which causes corresponding movement in the bellows end. *Id*. at ¶ 6. The T2 sensor communicates those changes in temperature to the T700 HMU, which then helps to set the optimal fuel ratio for the T700 engine. *Id*. at ¶¶ 2-3, 6.

## B.     The Grade A Joint and SP-865

Woodward's "Engineering Drawings," "Process Drawings," and internal "Shop Procedures" govern its production of the T2 sensor.  *Id*. at ¶¶ 8-9.  Shop Procedure 865 ("SP-865") describes the brazing procedure.  *Id*. at ¶ 9.  Brazing is a process that bonds two metal surfaces by heating both surfaces and a filler metal until the filler metal flows into a joint by capillary action.  *Id*. at ¶ 14.

The T2 sensor's "Grade A" joint connects the capillary tube to the "sensor head" at the bellows end.  *Id*. at ¶ 18.  To braze that joint, Woodward first applies a small amount of "stop-off" that prevents filler metal from flowing into the capillary tube.  *Id*. at ¶ 19.  Next, Woodward applies braze paste containing "flux" to enhance the flow of braze material.  *Ibid*.  The brazing process is completed in a furnace using an automated process.  *Id*. at ¶ 16.  The process creates two lines of brazing material along the edges of the joint—with only one being visible from the outside of the assembly—called "fillets."  *Id*. at ¶ 24.  The T2 sensor undergoes several tests before shipment.  *Id*. at ¶¶ 30, 32, 35-39.  Woodward completed a "Certificate of Conformance" with each shipment; the document states that Woodward "certif[ies] that such supplies were in the Quantities and of the Quality called for, and were in all respects in accord with the applicable specifications."  *Id*. at ¶ 143.

A few sections of SP-865 are pertinent here.  Section 5.0 and Table 17.1.1 require "Class 1" joints to have a diametrical clearance (the area between the two pieces of metal being brazed) within a specific range.  *Id*. at ¶¶ 50, 53.  Sections 12.1.5 and 12.1.6 state that "[a]ll evidence of stop-off" and "all evidence of flux must be removed."  *Id*. at ¶ 54.  Section 6.1.1 requires a "visual inspection" for "filler material" of the Grade A joint's "exposed edges" (the fillets), and

if "evidence of braze flow is not apparent by visual inspection … an alternate inspection method may be used [such as x-ray]." *Id*. at ¶ 56.

Before 1996, an engineering drawing for a predecessor part of the current T2 sensor did not call for an x-ray inspection. *Id*. at ¶ 26. In 1996, Woodward added an x-ray requirement, but later found that the sensor's density and configuration prevented useful x-rays. *Id*. at ¶ 27. Woodward engineer Steve Krugler concluded that the x-ray inspection was unnecessary, and a 1997 revision to the engineering drawing deleted that requirement. *Id*. at ¶ 28.

In early 2004, Woodward received a shipment of capillary tubes that did not conform to specifications. *Id*. at ¶ 61. Although GE and DoD permitted Woodward to use nonconforming parts under certain circumstances, *id*. at ¶¶ 58-59, Woodward belatedly issued a nonconformance report informing GE that the capillary tubes were non-conforming but safe. *Id*. at ¶ 61. Woodward Assembly and Test Leader Mark Meichtry, who served as Relators' supervisor, was disciplined for failing to timely notify GE. *Ibid*.

C.  **Relators' Complaints and Woodward's Investigation**

While employed by Woodward, Relators worked on the T2 sensor. *Id*. at ¶ 63. In early 2005, Diedrich (the T700 project engineer) asked Materials Engineer Barb Swanson to investigate certain problems with the T2 sensor. *Id*. at ¶¶ 69-70. Marshall volunteered to examine the issue, *id*. at ¶ 70, and asked x-ray technician Mark Frutig to x-ray the joint, *id*. at ¶ 74. Based on her and Frutig's assessment, Marshall concluded that the diametrical clearance of the Grade A joint was too small, and that stop-off and flux were not removed, which risked contaminating the joint. *Id*. at ¶ 78. Marshall also concluded Woodward was using braze material for another T2 sensor joint (the "Grade D joint") to "mask problems" with the Grade A joint by "creat[ing] a secondary seal [over] the Grade A joint." *Id*. at ¶ 68.

On April 6, 2005, Marshall conveyed her conclusions to two other Woodward employees, and she told Meichtry (Relators' supervisor) and Steven Gorman (Meichtry's supervisor) that Relators would cease working on the T2 sensor because of their concerns. *Id*. at ¶¶ 72, 81. Diedrich and Senior Engineer David Kunchinski investigated the issue. *Id*. at ¶ 85. On April 12 and 13, Meichtry informed Relators that the engineers had concluded that the T2 sensor "parts were good to ship." *Ibid*. Relators still refused to work on the sensor. *Ibid*.; Doc. 218 at ¶ 20.

Relators suggest that Meichtry was unreceptive to their complaints even before Diedrich and Kunchinski's investigation. On April 7, Meichtry sent an email to Marshall and Thurman stating: "Let's keep this job moving." Doc. 218 at ¶ 8. Meichtry also told Relators on April 12 that, as Relators describe what he said, "(1) it's going to take too much time and cost too much money to fix these problems, (2) GE wants the parts regardless of the problems and (3) it's the two of you against the world." Doc. 204 at ¶¶ 82, 85.

On April 14, Relators met with Gorman, Diedrich, Meichtry, Quality Director Spitty Tata, and Human Resources Manager Carol Smith. *Id*. at ¶ 86. Gorman told Relators that Woodward had concluded that the parts were okay. *Id*. at ¶ 88. Marshall was not convinced. *Ibid*. Tata asked what Woodward could do to assure Marshall the parts were "good." *Id*. at ¶ 89. Marshall asked Tata to x-ray twenty parts. *Ibid*.

In response, Swanson and Diedrich reviewed x-rays and said that they had observed no problems, as there was no evidence of filler from the Grade D joint "coming across and enclosing the entire fillet of the Grade A joint." *Id*. at ¶ 95. Meichtry and Diedrich provided Relators with sixteen x-rays, fourteen of which were too dark. *Ibid*. Although two of the x-rays showed some evidence of masking, the engineers concluded that "for masking to create a

problem, the filler metal from the Grade D joint would have to completely cover the Grade A

joint … because it was extremely remote that you could have braze flowing into the exact proper

spot to seal off a leak." *Ibid.* (internal quotation marks omitted).  Unconvinced, Relators entered

Woodward's premises the night of April 14 without authorization, took several scrap parts, cut

and examined them, and took them home.  *Id.* at ¶ 90.  Marshall said that she found evidence of

masking.  *Id.* at ¶¶ 86, 89-90.

On April 18, despite Woodward's conclusion that everything was fine, Relators

maintained that they were still unwilling to work on the T2 sensor parts.  *Id.* at ¶ 96.  Woodward

asserts that Meichtry then suspended Relators, while Relators assert that they were fired.  *Ibid.*

Marshall then called a hotline established by Woodward to report suspected violations of

its ethics policies.  *Id.* at ¶¶ 97, 100.  Marshall reported that the T2 sensor did not comply with

SP-865, that this non-compliance raised a "safety issue," and that she had been terminated.  *Id.* at

¶ 100.  In response, Woodward General Counsel Robert Reuterfors told Relators that Woodward

had referred the matter to its Business Conduct Oversight Committee ("BCOC") and that "for the

present you are on administrative leave, with pay continuation."  *Id.* at ¶ 101.  On April 20,

Marshall sent a letter to a United States senator asserting that she had been terminated for

refusing to work on an "unreliable sensor" that jeopardized the safety of military helicopters.  *Id.*

at ¶ 83.

On April 22, Reuterfors asked Senior Engineer Ted Erickson to conduct a special review

of Relators' concerns, stating that if Erickson "agree[d] with [Relators], [he] should say so and

let the chips fall where they may."  *Id.* at ¶ 104.  Erickson's study concluded that: (1) nothing

from the field showed that the Grade A joint was inferior; (2) any "masking … would [not] be

relevant"; (3) x-ray inspection was not necessary; (4) the furnace-brazed joint was not subject to

Table 17.1.1 of SP-865; and (5) using stop-off did not affect the joint's quality. *Id*. at ¶ 106. At Reuterfors's request, Tata also prepared a report, which reached conclusions similar to those reached by Erickson. *Id*. at ¶ 107. Tata did note that the Grade A joint's diametrical clearance did not meet SP-865 and was "tighter than preferred," but that "the print allows for this difference and there is integrity in the joint." *Ibid*.

Based on these findings, the BCOC concluded that Relators "did not credibly allege a violation of any applicable standard of conduct." *Id*. at ¶ 108. The BCOC further concluded that Relators "acted unreasonably in refusing to work in the face of all the input from their supervisor, from QA, and from engineering regarding appropriate manufacturing and testing procedures for the T2 sensor." *Ibid*. (internal quotation marks omitted). The BCOC advised that Woodward would be justified in terminating Relators' employment. *Ibid*.

On May 4, Woodward HR sent Relators a letter informing them of the BCOC's conclusion. *Id*. at ¶ 109. The letter told Relators that their administrative leave had ended and that they should schedule a meeting with their director, Kirk Snyder; otherwise, Woodward would accept Relators' "voluntary resignation." *Id*. at ¶¶ 109-110; Doc 199-17 at 34. At the meeting, Relators remained unwilling to work on T700 parts because they continued to believe that Woodward was violating SP-865. Doc. 204 at ¶ 115. Snyder asked Relators to resign and signaled that, if they did, he would not contest their application for unemployment benefits. *Id*. at ¶ 116. Relators refused, and Snyder terminated them. *Ibid*.

### D. Review of Relators' Allegations by DoD and GE

Meanwhile, unbeknownst to Woodward, Marshall retained an attorney, who shared Relators' allegations with DoD Special Agent Dan Boucek. *Id*. at ¶ 124. Agent Boucek met with Relators and their lawyer on April 26; at that meeting, Relators presented their concerns and

gave Agent Boucek custody of the scrap parts they had taken from Woodward on April 14 and
Woodward documents that, Relators believed, revealed Woodward's violations. *Ibid*. The
government retained custody of the parts until January 30, 2012, *ibid*., a week before it filed its
notice of election to decline intervention, Doc. 19.

After the April 26 meeting, Agent Boucek asked United States Defense Contract
Management Agency ("DCMA") Lead Technical Representative Harrison DySard, who was
responsible for monitoring contract compliance for contractors in the relevant geographic area, to
review Relators' concerns. *Id*. at ¶ 125. On April 29, DySard met with Boucek and learned of
Relators' concerns in more detail. *Ibid*. By May 2, DySard had concluded that there were no
imminent safety concerns that would warrant "do[ing] anything like put[ting] out a safety alert
and down[ing] the entire fleet of Blackhawks and Apaches." *Id*. at ¶ 126. Still, DySard told a
colleague that "[w]e will be looking at the sensor with new eyes and I will keep in touch as the
process evolved." *Ibid*. DySard then conducted an "audit" of the parts and examined the results
from the Grade A joint's braze. *Id*. at ¶ 127. In conducting the audit, DySard sought to "work[]
out a plan where [he] could audit this particular sensor without drawing attention to the
complaints that [Relators] had with Woodward" because he did not want to inform Woodward of
the audit." *Ibid*. (first alteration in original). As a part of his audit, DySard spoke with operators
and checked their qualifications, and reviewed engineering drawings and product deficiency
reports. *Id*. at ¶ 128. DySard also communicated with his counterpart at GE, Ed Craft, laying
out in detail Relators' concerns with the T2 sensor. *Id*. at ¶ 129. During the investigation, Tata
inaccurately stated that Grade A joints were regularly x-rayed. *Id*. at ¶ 128.

In a November 21, 2005 email to Boucek, a DCMA official, and an Air Force Major,
DySard summarized his findings, stating that he "completed all the auditing of the T2 sensor and

have found nothing either incorrect or wrong with the procedures, assembly, or testing of the sensors"; that "Woodward and GE both have investigated the claims by [Relators] and have also determined that nothing incorrect or wrong is being done"; that he "found no evidence Woodward has tried to cover anything up, asked people to violate assembly procedures or testing requirements, or did anything wrong"; that problems with "the outer shield on the T2 sensor" were "quickly resolved by both Woodward and it[]s supplier"; that "[t]oo often people think they have a better way of doing things but that certainly does not mean that the old way is wrong, illegal, or involves fraud"; that "I have witnessed testing, witnessed assemblies, inspected final assemblies, inspected fuel controls containing the sensor, reviewed engineering reports, listed to theory from engineers and found nothing to substantiate the claim that Woodward is, or was involved in fraud on this part"; that "to make this unproved allegation public would be unfair to Woodward Governor and cause needless concern where none belongs"; and that the "[b]ottom line is [his] investigation is over and the allegation by the two women was not supported by any evidence." *Id*. at ¶ 133 (alteration in original). DySard then informed DCMA Administrative Contracting Officer Linda O'Rourke, the officer with the authority to make contracting decisions regarding the T2 sensor, of his conclusions. *Id*. at ¶ 134. DoD continues to buy the parts without having requested any changes or financial considerations, and it continues to certify that the T2 sensor conforms to specifications. *Id*. at ¶¶ 135, 144.

Woodward informed GE's Manager of Midwest Technical Resources, Gary Page, of Relators' complaints around May 4, 2005. *Id*. at ¶ 136. GE conducted an investigation into at least the masking allegation and concluded that it did not present a problem. *Id*. at ¶¶ 137-40. Page and two other GE employees testified that GE never had any issues with the quality of the T700 HMU. *Id*. at ¶ 141.

**Discussion**

**I.      The FCA *Qui Tam* Claim**

"An FCA claim … has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false."  *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005).  In addition, the allegedly false statement must be "material" to the government's decision to pay or approve the false claim, which means that the statement could "have influenced (or naturally tended to influence) the [government's] decision to" pay.  *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 830 (7th Cir. 2011).

Relators argue Woodward falsely certified in its Certificates of Conformance that its parts were "in the Quantities and of the Quality called for[] and were in all respects in accord with the applicable specifications," given that it did not comply with SP-865 or the shop procedure controlling capillary tubes.  Specifically, Relators contend Woodward did not (1) x-ray or otherwise inspect the non-visible edge of the Grade A joint, (2) give the Grade A joint the appropriate diametrical clearance, (3) remove all evidence of stop-off and flux, and (4) deliver the appropriate capillary tubes.  Doc. 213 at 22-39.  Woodward responds that its certification did not certify compliance with its shop procedures and that, in any event, the parts complied with those procedures.  Doc. 198 at 26-33.  It is unnecessary to delve into those issues because, even assuming that the term "applicable specifications" in the certification encompassed compliance with Woodward's internal procedures, that Relators' interpretation of SP-865 is correct, and that Woodward's T2 sensors failed to meet the requirements of Relators' interpretation, the *qui tam* claim still fails on two independent grounds: the summary judgment record indisputably shows that Woodward's statements were neither knowingly false nor material.

10

## A. Knowledge

"The False Claims Act does not penalize all factually inaccurate statements, but only those statements made with knowledge of their falsity." *Yannacopoulos*, 652 F.3d at 832. A relator can prove knowledge by showing that the defendant "(1) ha[d] actual knowledge of the information; (2) act[ed] in deliberate ignorance of the truth or falsity of the information; or (3) act[ed] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b); *see United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). The Seventh Circuit has held "differences in interpretation growing out of a disputed legal question are … not false under the FCA." *Lamers*, 168 F.3d at 1018. Nor are "errors based simply on faulty calculations or flawed reasoning," "innocent mistakes," or "negligence." *Ibid*. Rather, Relators must show Woodward knew that Relators' concerns about the parts were valid but nevertheless chose to certify the parts to DoD. *See Yannacopoulos*, 652 F.3d at 837 ("None of the evidence on which Yannacopoulos relies is sufficient to show either the falsity of the coproduction line item price … or Lockheed's knowledge of that falsity."). The summary judgment record would not allow Relators to make that showing.

Relators argue that Woodward knew that its certifications were false because Krugler "approv[ed] the deletion of the x-ray requirement" and "claim[ed] that a leak test is sufficient while knowing that it does not verify a joint is Grade A." Doc. 213 at 36. This argument is circular, for it assumes its own conclusion—the one reached by Relators' experts, that an x-ray test was necessary to ensure that the Grade A joint was leak proof. *Ibid*. (citing Doc. 218 at ¶¶ 61-65). But this evidence does not show that Krugler knew that an x-ray test was necessary to avoid a leaky Grade A joint. At most, the evidence shows that Krugler simply was wrong in failing to recognize that failure to x-ray would inevitably result in leaky Grade A joints. Relators

themselves acknowledge this point, asserting that "Krugler did not inform GE of any problems with the Grade A joint because, according to … Krugler, he was not aware of any problem." Doc. 218 at ¶ 64.  Yet "flawed reasoning" and "negligence" are insufficient to show knowledge under the FCA.  *Lamers*, 168 F.3d at 1018.  Krugler could not have *known* the parts were defective if he was "not aware of any problem."

Relators also assert that after Marshall told Meichtry about her investigation, Meichtry told Relators (as Relators recount his words) that "(1) it's going to take too much time and cost too much money to fix these problems, (2) GE wants the parts regardless of the problems[,] and (3) it's the two of you against the world."  Doc. 213 at 7; Doc. 204 at ¶¶ 82, 85, 148.  This also does not establish knowledge.  The fact that Meichtry *at one point* might have believed that the parts were defective does not allow an inference that Woodward believed that they were defective, or acted with deliberate indifference or reckless disregard to their quality, *at the time* it shipped them and certified its compliance with the applicable requirements.

Additionally, for the knowledge element to be met, those involved in the certification process—*i.e.*, those making the statement to the government—must have believed at that time that Relators were right.  Thus, even if Meichtry initially believed Relators, nothing in the record shows that he or any other Woodward employee shared Relators' concerns when a certification was made.  To the contrary, the evidence indisputably shows that Woodward investigated Relators' complaints and concluded that the parts were fine.  Relators have adduced no evidence casting doubt on the sincerity of Woodward's conclusions.  It follows that Woodward's certifications were not knowingly false.  *See United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741-42 (7th Cir. 2007) (rejecting an FCA claim on similar grounds where the relators alleged that the defendant fraudulently billed the government for prescriptions that

had been returned to the defendant, but failed to adduce evidence that the fraud was knowing, because they had no evidence of the defendant's interaction with the government), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009).

**B.     Materiality**

Even if Relators could prove knowledge, their *qui tam* claim fails because no reasonable jury could find that Woodward's allegedly false statements were material.  Section 3729(b) defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  According to Woodward, Relators' allegations could not have been material because the DCMA "found nothing either incorrect or wrong" with its products, Doc. 204 ¶ at 133, "GE concluded that 'everything was acceptable,'" *id.* at ¶ 140, and "with full knowledge of Relators' allegations, the Government continues to buy the T2 sensor … and … expressly certify that the sensor conforms to specifications," Doc. 198 at 37 (citing Doc. 204 at ¶ 144).

Relators first argue that this evidence is irrelevant because materiality is assessed objectively, meaning that the allegedly false statements must have "a natural tendency to influence, or be capable of influencing, the decision of the decision-making body to which it was addressed."  Doc. 213 at 37; *see Yannacopoulos*, 652 F.3d at 830; *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).  Woodward agrees that this is the correct standard, but observes that evidence that "the fully-informed Government continues to purchase and pay for the product is legally dispositive evidence that any alleged fraud concerning the products quality is not capable of influencing the payment decision."  Doc. 217 at 11 (emphasis removed).

Seventh Circuit precedent supports the view that a *qui tam* defendant's allegedly fraudulent certifications to the government are immaterial when the government is aware of the

allegations of falsehood, looks into them, and proceeds to do business with the defendant.  In *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir. 1999), the court held that the relator's allegation that the defendant violated federal testing standards for blood plasma could not have been found material by a reasonable jury because "the Department of Justice has conspicuously declined to adopt Luckey's position or to prosecute this claim on its own behalf" and "the federal government is 100% satisfied with the blood products it receives from Baxter and with the representations made in connection with the sales." *Id*. at 733.  In *Yannacopoulos*, the Seventh Circuit held that because the government "had already been notified of General Dynamics' [alleged non-compliance,] … no reasonable jury could think General Dynamics' failure to [disclose its non-compliance by] check[ing] the proper box in the Certification Agreement was a material false statement, as required for liability under the False Claims Act." 652 F.3d at 828. And in *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009), the Seventh Circuit observed that "[i]f the military services knew what they were getting and decided to accept [parts] that [the relator] deems 'inferior' rather than pay a higher price, then Rolls-Royce will prevail on the merits." *Id*. at 855.  *Cf. Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1050-51 (9th Cir. 2012) ("Air Force personnel responsible for oversight of the RSA IIA project testified that there is no requirement that FOSS be disclosed. … Lockheed submitted overwhelming evidence that it shared with the Air Force in its Disclosure Letters the use of FOSS and also disclosed to the Air Force its testing procedures.  Accordingly, Hooper's claims fail because he has failed to demonstrate the existence of a genuine issue of material fact as to whether Lockheed 'knowingly' submitted a false claim."); *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010) ("OBO inspectors routinely examined and approved First Kuwaiti's work.  Evidence that the government officials

were aware of any alleged defects and accepted First Kuwaiti's work anyway 'effectively negates the fraud or falsity required by the FCA.'") (quoting *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999)).

These principles defeat materiality here. The record shows that DoD understood Relators' allegations, conducted an extensive review, determined that there was no problem and that Relators' concerns were unfounded, and continued to purchase the parts from Woodward. Specifically, Relators gave scrap parts to and met with Agent Boucek and shared their concerns, Doc. 204 at ¶ 124; DCMA technical specialist DySard met with Relators and their lawyers and determined there were no imminent safety concerns, *id*. at ¶¶ 125-26; DySard's months-long review confirmed that there was no problem, a fact that he conveyed to Boucek and the DCMA, explaining that he "found nothing either incorrect or wrong with the procedures assembly, or testing of the sensors," that "Woodward and GE both have investigated the claims by [Relators] and have also determined that nothing incorrect or wrong is being done," that he "found no evidence Woodward has tried to cover anything up … or did anything wrong," and that the "[b]ottom line is [his] investigation is over and the allegation by the two women was not supported by any evidence," *id*. at ¶¶ 127, 133; DoD retained custody of the scrap parts for about seven years, after which the United States declined to intervene in this case, *id*. at 124; and DoD continues buying the T2 sensor without requesting any changes or financial consideration, *id*. at ¶¶ 135, 144. Given all this, and under the above-cited precedents, Relators cannot satisfy the materiality element of their *qui tam* claim.

To be sure, materiality is an objective, not subjective, element. As *Rogan* put it, "[a] statement or omission is 'capable of influencing' a decision even if those who make the decision are negligent and fail to appreciate the statement's significance." *Rogan*, 517 F.3d at 452. So

DoD's decision to continue doing business with Woodward, standing alone, is not dispositive of materiality. It is important to note, however, that *Rogan* made the statement just quoted in response to the defendant hospital's argument that its failure to disclose to Medicare and Medicaid information regarding illegal physician referrals was immaterial to the government's decision to approve the defendant's claims because materiality may be shown only if "a federal employee in a position to take a decision had to testify that the government was sure to enforce the statute." *Ibid*. In rejecting that argument, the Seventh Circuit held that "[t]he question is not remotely whether [the hospital] was sure to be caught—though it would have been, had it disclosed the truth on all 1,812 reimbursement requests—but whether the omission could have influenced the agency's decision," and that "[t]estimony from a claims-processing officer along the lines of 'I follow the law' is not required." *Ibid*.

Here, by contrast, the government was not even remotely in the dark about the possible fraud, as Relators informed DoD of their concerns about the T2 sensor. DoD listened to Relators' concerns and took custody of the scrap parts they had taken from Woodward's premises, conducted a lengthy, independent review, determined that all was in order, and then continued to purchase from Woodward parts for the military's Blackhawk and Apache helicopters. As DySard wrote after concluding his months-long review, "I have witnessed testing, witnessed assemblies, inspected final assemblies, inspected fuel controls containing the sensor, reviewed engineering reports, listed to theory from engineers and found nothing to substantiate the claim that Woodward is, or was involved in fraud on this part," and that "[b]ottom line is … the allegation by the two women was not supported by any evidence." Doc. 204 at ¶ 133. The test for materiality asks whether the alleged falsehoods could have influenced a "reasonable reviewing official," *Feldman*, 597 F.3d at 96—not an idiosyncratic one. As in

*Luckey* and *Yannacopoulos*, no reasonable jury could conclude on this record that a reasonable reviewing official or government agency would have terminated Woodward's contract and/or demanded a refund for the T2 sensors.

Relators respond that "there are numerous issues of fact regarding what … DySard did, what he concluded, variations in his deposition testimony and what … Tata said to … DySard which, individually and collectively, negate Woodward's suggestion that such evidence is a basis for summary judgment."  Doc. 213 at 37-38.  Relying on their expert reports, Relators assert that because DySard's "audit was not done at a level appropriate to this issue, namely, whether the T700 parts are airworthy in light of the fact that the Grade A joint is not inspected as required," the government was "not fully informed."  Doc. 204 at ¶¶ 127, 135 (internal quotation marks omitted).  Relators also believe DySard's opinion is inadequate because "he was not informed about nor sought documents relating to" a series of issues.  *Id*. at ¶¶ 127-28, 144.

This does not add up to materiality.  Relators essentially contend that the government should have conducted a more intensive investigation—*i.e.*, that the gravity of their allegations *should have* prompted a more-intensive investigation that *would have* revealed the fact and severity of Woodward's fraudulent certifications.  This contention cannot be reconciled with *Luckey*, *Yannacopoulos*, and *Lusby*, which teach that where the government knows about the allegedly false statements, looks into them, concludes that nothing is wrong, and continues doing business with the defendant anyway, there is no materiality despite what the relator thinks the government should have done.

Finally, Relators assert that the government was misinformed because Tata incorrectly told DySard that the Grade A joint was subject to regular x-ray inspections.  Doc. 204 at ¶ 47; Doc. 224 at 19.  Yet Relators do not explain how DySard's conclusions would have changed had

he known that Woodward did not regularly x-ray the part, and given the extensive and far-reaching nature of DySard's review, no reasonable jury could find that his conclusions would have changed.

## II.     The Retaliation Claims

### A.     The FCA Retaliation Claim

Relators claim that they were unlawfully discharged in violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).  Before Congress amended the statute in 2009, and at all relevant times, § 3730(h) provided that:

> Any employee who is discharged … by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2006).[*]  To prevail on their claim, Relators must show that (1) their conduct was "in furtherance of an action under [the FCA]" and (2) "that [their] protected conduct was connected to [Woodward's] decision to fire [them]."  *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012).  Even if that Relators could satisfy the first element, they cannot show that Woodward terminated their employment because they engaged in protected conduct.

The statute provides that causation is present if an employee is discharged "because of lawful acts done by the employee … in furtherance of an action under this section."  31 U.S.C. § 3730(h) (2006).  In *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469 (7th Cir. 2004), the Seventh Circuit held that causation under § 3730(h) required proof that the

---

[*] Section 3730(h) was amended in 2009, *see* Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21 § 4, 123 Stat. 1617, 1621-25 (May 20, 2009), but the amended version applies only "to conduct on or after" May 20, 2009, *id*. § 4(f), 123 Stat. 1625, and thus does not apply to Relators' retaliation claim.  No party suggests that the amendment materially changed the meaning of § 3730(h), so the court will seek guidance from both pre- and post-2009 case law.

employee's protected conduct was "motivated, at least in part, by the protected conduct." *Id*. at 479. That mixed-motive analysis no longer governs FCA retaliation claims. In *Gross v. FBL Financial Services Inc.*, 557 U.S. 167 (2009), the Supreme Court held that the phrase "because of" in the Age Discrimination in Employment Act ("ADEA") requires the plaintiff to prove "but for" causation. *Id*. at 176 ("Thus, the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act. To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision.") (citations omitted). *Gross* explained that because the ADEA, unlike Title VII, prohibits only discrimination "because of" an individual's age, "plaintiff[s] retain[] the burden of persuasion to establish that [the improper motive] was the 'but-for' cause of the employer's adverse action." *Id*. at 177. The Seventh Circuit has interpreted *Gross* to mean that "[m]ixed-motive theories of liability are always improper in suits brought under statutes without language [permitting claims where] an improper consideration was '*a motivating factor*' for the contested action." *Serafinn v. Local 722 Int'l Bhd. of Teamsters*, 597 F.3d 908, 915 (7th Cir. 2010). Thus, although *Gross* is an ADEA case, its reasoning extends to the causation element of all employment cases. *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010) ("Although the *Gross* decision construed the ADEA, the importance that the court attached to the express incorporation of the mixed-motive framework into Title VII suggests that when another anti-discrimination statute lacks comparable language, a mixed-motive claim will not be viable under that statute."); *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009) ("unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law"). And because

§ 3730(h) has the same "because of" language as the ADEA, Relators must show their protected conduct was a "but-for cause of [their] discharge"—meaning that Woodward "would [not] have [discharged them] in the absence of [the] proscribed motive." *Serwatka*, 591 F.3d at 963.

Relators maintain Meichtry fired them on April 18, 2005, Doc. 213 at 42, and there is evidence to support their view, Doc. 204 at ¶¶ 95-96, 101. There also is evidence that Meichtry told Relators on April 12 that, in Relators' words, "(1) it's going to take too much time and cost too much money to fix these problems, (2) GE wants the parts regardless of the problems[,] and (3) it's the two of you against the world." Doc. 204 at ¶¶ 82, 85. According to Relators, Meichty's frustration shows that he terminated them because they had raised questions about the T2 sensor.

That argument is without merit, as the record would not allow a reasonable jury to find that Meichtry terminated Relators *because* they had raised concerns with the part. The record indisputably shows that by the time Meichtry fired Relators on April 18, engineers Diedrich and Kunchinski had reported that Relators' concerns with the part were unfounded, *id*. at ¶ 85; that after the April 12 meeting, Gorman, Diedrich, Meichtry, Tata, and Smith met with Relators and informed them that Woodward had concluded the part had no problems, *id*. at ¶ 88; and that Swanson and Diedrich conducted the tests requested by Relators, again concluding the parts were good, *id*. at ¶ 95. So even assuming that Relators refused to work on the T2 sensor due to a sincere belief that Woodward was violating governing safety standards, their belief did not insulate them from the consequences of refusing to work on their assigned tasks.

This conclusion finds support in *Arres v. IMI Cornelius Remcor, Inc.*, 333 F.3d 812 (7th Cir. 2003). *Arres* considered an Illinois common law retaliatory discharge claim on the following facts: the plaintiff, a person named Arres, was the human resources manager of the

defendant, a company called Remcor; the Social Security Administration raised questions about the Social Security numbers of several Remcor employees; believing that those employees were undocumented immigrants, Arres recommended that Remcor fire them; after consulting with the Social Security Administration and its attorneys, Remcor instead wrote to the employees asking them to correct any errors in the Social Security numbers they had provided; believing that Remcor's approach violated federal law, Arres refused to process the employees' paperwork; and Remcor fired her, leading Arres to charge that she had been fired in retaliation for insisting that Remcor follow federal law.  *Id*. at 813.  In affirming the rejection of Arres' retaliation claim on summary judgment, the Seventh Circuit observed:

> Arres is wrong to suppose that either state or federal law gives her any right to follow an idiosyncratic view of the law's demands.  Remcor did exactly what the Social Security Administration and its legal counsel suggested: before firing anyone, it tried to separate those who had made inadvertent errors from those who are not entitled to work in the United States.  Doing this enabled Remcor to respect the rights of aliens who have work authorization while also following its duties under [federal law].  A human resources manager is not free to impose a different approach unilaterally; that's nothing but insubordination.  Imagine the disruption in workplaces everywhere if every person were legally privileged to act (or not act) based on her own view of what the law (federal or state) requires, and managers were helpless to do anything in response.  Neither state nor federal law creates such an untenable system.  That Arres did not agree with counsel's view of Remcor's legal obligations is not a justification for insubordination.

*Id*. at 814.

*Arres*'s analysis of the Illinois retaliatory discharge tort applies with equal force to § 3730(h) claims.  *See Lang v. Nw. Univ.*, 472 F.3d 493, 495-96 (7th Cir. 2006); *Hindo v. Univ. of Health Sciences/The Chicago Med. Sch.*, 65 F.3d 608, 614-15 (7th Cir. 1995) (noting the identity between Illinois common law retaliatory discharge and § 3730(h)).  Indeed, in its first decision interpreting § 3730(h), and mirroring what it later said in *Arres*, the Seventh Circuit held that "an employee who … imagines fraud but lacks proof … legitimately may be sacked,"

and that "employees who … behave like Chicken Little … impose costs on employers without advancing any of the goals of the False Claims Act." *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994), *abrogated on other grounds*, *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409 (2005). The Seventh Circuit made the same point in *Lang*, dispatching a § 3730(h) claim with this analysis:

> The district court concluded that Lang had played the part of Chicken Little. She imagined fraud but lacked any objective basis for that belief; the people who fed her the rumors also lacked proof. There was no fire; there was not even smoke; there was just imagination run amok, and with no legitimate action "to be filed" no protection from § 3730(h). That assessment is spot on. Lang may have been a thorn in management's side, but the statute is not designed to protect pests, who are more trouble than they are worth.

472 F.3d at 495; *see also Fanslow*, 384 F.3d at 481 ("The statute does not, however, protect an employee who just imagines fraud without proof.").

No reasonable jury could think any differently of Relators' situation. Woodward was entitled to terminate Relators for refusing to work on the T2 sensor after its extensive investigations concluded that nothing was amiss, as it would have done to any employee who had stopped working for any other faulty reason. Moreover, as discussed above, there is no evidence that Woodward actually believed the parts were defective, such that its stated reason for terminating Relators could be construed pretextual. Even if Meichtry harbored some animus towards Relators because of their complaints, no reasonable jury could find that Woodward would have tolerated their refusal to work and allowed them to keep their job but for their FCA-protected conduct.

Relators contend "they could have been reassigned [by Woodward] to work on other parts." Doc. 213 at 43. That argument lacks merit. Unlike the Americans with Disabilities Act ("ADA"), which obligates an employer to make a reasonable accommodation for employees with disabilities, including by transferring them to a different position, *see Spurling v. C&M Fine*

*Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014); *EEOC v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012), the FCA imposes no such obligation for insubordinate employees who refuse to work on certain projects.

### B.      The State Law Retaliation Claim

Relators also bring a retaliatory discharge claim under Illinois law.  "To state a valid retaliatory discharge cause of action, an employee must allege that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009); *see also Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009); *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 628 (7th Cir. 2009).  It is a "well-established principle in Illinois retaliatory discharge cases that '[t]he element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee.'" *Meister v. Ga.-Pac. Corp.*, 43 F.3d 1154, 1160 (7th Cir. 1995) (alteration in original) (quoting *Hartlein v. Ill. Power Co.*, 601 N.E. 2d 720, 728 (Ill. 1992)).  For the reasons just discussed, Woodward indisputably had a valid reason for terminating Relators, meaning that they cannot establish the causation element of their state law claim.

### Conclusion

For the foregoing reasons, Woodward's summary judgment motion is granted.  Judgment will be entered in favor of Woodward and against Marshall and Thurman.

March 27, 2015

_____
United States District Judge